CATTARAUGUS COUNTY.—HON. ALFRED SPRING, SUR-
ROGATE.—August, 1882.

SHELDON v. DOW.

*In the matter of the probate of the last will and testament*
*of* DEMARIUS SHELDON, *deceased.*

The same acute perceptions and enlarged comprehension are not requisite in a testator disposing of a few acres of land in a rural district, and a few securities, as in one distributing a diversified property of the value of a million dollars.

Where all the persons interested in procuring the rejection of an alleged will are of full age, and none of them authorizes any appearance, but the sole contestant is one named as executor in a prior will, he, being in court by virtue of a mere technical provision of statute, stands in the attitude of a volunteer; and proof of mental incapacity on the part of decedent should be of unusual force to justify a court in refusing probate.

The paper propounded as testatrix's will was executed in January, 1881, about two months before her death, and when she was nearly eighty years of age. For more than three years she had been an invalid, in consequence of an attack of paralysis, before which she had been of

fair intelligence, of a reticent disposition, and a diligent reader. She had no children, but was the widow of S., one of whose grandchildren was principal devisee in the will. Her property consisted of a homestead of a few acres, and a small amount in securities. Nothing in the will indicated a lack of mental vigor, or called for criticism. During four months preceding the execution, she was under the care of others, by whose testimony it appeared that she was the victim of hallucinations—as that she was not in her room when she was, that it had been altered, that it was occupied by gipseys or Indians, that she had been confined in a cellar, etc.; which delusions, however, were intermittent, and not of daily occurrence. Proponent's evidence, on the contrary, was plain to the effect that she was mentally capable. In short, there was a conflict of evidence, showing, on the one hand, that she was almost totally imbecile, and, on the other, that she retained her mental faculties sufficiently to qualify her to make a will. On the day of the drawing and execution of the paper propounded, she conversed intelligently with the draftsman as to changes to be made in her dispositions as contained in a prior will, and directed that will to be burned; and the testimony of the subscribing witnesses, so far as it disclosed the facts, showed nothing irrational as then occurring.—

*Held,* that, in view of the conflict of evidence as to decedent's capacity previously to the time of execution, the controversy must be narrowed down to that period; that the evidence disclosed a mental condition at that time sufficiently sound to enable her to make a will; and that the petition for probate must be granted.

Delafield v. Parish, 25 *N. Y.*, 1—compared.

APPLICATION, for the probate of decedent's will, by Albert G. Dow, named as executor therein; opposed by George Sheldon, named as executor in an alleged prior will. The facts appear sufficiently in the opinion.

WM. H. HENDERSON *and* J. G. JOHNSON, *for proponents.*

HUDSON ANSLEY *and* F. W. STEVENS. *for contestants.*

THE SURROGATE.—The last will and testament of testatrix, which is here offered for probate, was executed on January 31st, 1881, when she was nearly eighty years of age. Although deceased left a sister and others, who would be benefited by the rejection of the

instrument propounded, objections are filed only on be-
half of the executor of a previous will.   While the ob-
jections are of the usually elaborate kind, the contest
really hinges upon the single question of the mental ca-
pacity of testatrix—was she of sound disposing mind
and memory at the time of the execution of the will?

Previously to the paralytic attack which culminated in
her death, the testatrix was a lady of fair intelligence,
of taciturn, reticent disposition, a devoted member of
the congregational church of Randolph, and a diligent
reader of religious books and papers.   For three or four
years before her decease, she had been an invalid by rea-
son of an attack of hemiplegia, which incapacitated her
from engaging in manual labor.   She never had any
children, and her nearest relative was a sister who re-
sided near her, in Randolph.   At the time of her mar-
riage to Mr. Sheldon, he was the father of five children,
two of whom are now living, the others having died
leaving issue, among whom are Charles C. Sheldon, the
principal devisee of the instrument propounded, and
Thaddeus Sheldon, a devisee named in a former will.
The property of deceased consisted of a house and a few
acres of land in Randolph, upon which she resided at the
time of her death, with a few notes or mortgages, the
amount or kind of which was not developed upon the
trial.   There is nothing whatever in the will itself, indi-
cating a lack of mental vigor in the testatrix.

As far as can be gleaned from the voluminous mass of
testimony in the case, Charles C. Sheldon was regarded
with as much favor and affection by testatrix as anyone
else.   Her equable temperament never permitted her to
burst forth in ebullitions of either joy or anger, but she

never spoke disparagingly or in a vexed manner about Charles C. Sheldon. Nor is the will radically different from the one made in the spring preceding, when her mental faculties were certainly not sufficiently impaired to render her incapable of appreciating the condition and amount of her property, and who were the proper objects of her bounty. That will was made subsequently to the one sought to be propounded by the contestant in this case; and in that will she devised her real estate to Thaddeus Sheldon, and, in case he died without issue, to Charles C. Sheldon, and, after a few unimportant alterations, named the same persons residuary devisees and legatees, as in the will now under consideration; so that, in her treatment of those who possibly might have claims upon her, testatrix exhibited no striking peculiarity, nothing calling for criticism.

During the latter part of October preceding her death, a widow-lady, Mrs. Laura Ford, with her married daughter, moved into the house of testatrix, and remained there, taking care of her until her death, which occurred in March, 1881. Mrs. Ford and her daughter and several neighbors relate many acts and detail many conversations with testatrix, clearly showing she was at times deranged. Among other things, the testatrix had a hallucination to the effect that she was not in her room when actually occupying it. This was of frequent occurrence, and her attendant, Mrs. Ford, and others, would call her attention to familiar articles of furniture, but usually failed to arrest her attention, although, after a little rest or a nap, she would seem to understand where she was. Again, she would become possessed of the idea that her chambers had been altered by tearing

out the partition; that they were occupied by gipseys or Indians; that her house had been turned around; that she had been kept in a cellar while visiting with her sister. ⌒ often failed to recognize acquaintances of long standi. These and many other acts and conversations, detailed by the witnesses for the contestant, certainly show that the testatrix at times was incapable of transacting any business whatever, or even of realizing her condition.

But the proof offered on behalf of proponent is equally as plain and perspicuous that, at other times, she comprehended fully the matter at hand, and possessed testamentary capacity. Dr. Cowles, who was her attending physician when any was needed, had a conversation with testatrix upon religious subjects, in which she exhibited good sense and intelligence, and during his visits he says he discovered nothing in his patient irrational. Mrs. Latham, an aquaintance, relates a conversation wherein testatrix stated she desired to hire her to take care of her, and they failed to agree upon a price, Mrs. Latham desiring five dollars per week, and testatrix insisting that she could only afford to pay four dollars and fifty cents. Mrs. Ford confirms this story of her economy, as she admits that testatrix knew, to a cent, how their accounts stood, up to within a very few days of her death. Mrs. Earl narrates two or three conversations, wherein decedent made very intelligent inquiries, interspersed with pertinent remarks relative to a mutual acquaintance. Mrs. Earl also tells of a talk with Mrs. Sheldon, in which she spoke disparagingly of Mrs. Shumway, who was a free methodist, and alluded to women speaking in meeting, aptly quoting St. Paul in disapproval of this practice.

Again, Hon. Rodney R. Crowley, a reputable attorney, visited Mrs. Sheldon, professionally, on December 4th, 1880, and had her make the usual affidavit for a widowed pensioner, and also had her sign the usual pension vouchers. That she comprehended fully what she was doing, his clear statement of the conversation and of what occurred then, proves. And on March 4th, only a few days before her death, when she was very low, he called and went through a similar ceremony, and she recognized him, and, as far as her eyes and expression could convey any idea, she seemed to understand the nature of his business.

So that we have conflicting evidence establishing, on the one hand, that she was almost a driveling idiot, and, on the other hand, that she retained her mental faculties sufficiently to be capable of making her will; and the controversy must be narrowed down to the time when the will was executed.

The evidence shows to my satisfaction that, on the day the will was executed, she was in better condition than ordinarily; she had what is termed a " poor spell " on the preceding day, and, recovering from that, as is often the case, her mental powers were rendered more acute by the reaction. The will was drawn by ex-Senator Dow, an acquaintance of long standing, a member of the same church to which testatrix belonged, and the banker with whom she kept her little account. Mr. Dow states that, on the day he drafted the will, he was at the house fully two hours; that he had the other will with him, which he also had drawn; that, after a short and informal but perfectly intelligible conversation with testatrix, he stated or read to her the first devise or bequest in the will he had with

him, and asked what change, if any, she desired in that. She said she wished the homestead willed to Charles, as Thaddeus was East, and she did not think he would appreciate it. Her statements, anent the change in the legacy to the Home Missionary Society, were very sensible, that she would give liberally if the church would give *as* liberally. Upon Senator Dow stating that she had better do as she wished, regardless of what the church might do, she concluded to give only fifty dollars to the Missionary Society.

The few changes that were made in the will were made, certainly, at her suggestion, and, where any reason was given for any change, it seemed to be a reasonable one; and, where no reason was assigned, the change in the bequest does not seem in the least nonsensical. The attesting witnesses testify to sufficient to prove a formal execution of the will, and everything they saw there, as far as they disclose the facts, shows nothing irrational. After the will was drawn, testatrix was asked by Mr. Dow what should be done with the old will, when she said "burn it;" and it was accordingly burned.

This entire transaction, as detailed by Senator Dow, convinces me that testatrix, at that time, had a clear appreciation of her property, and to whom she designed it to pass upon her decease. The counsel for the contestant, in their arguments, which were very able and prepared with care, rely largely upon the famous Parish will case (*25 N. Y., 1*). In that case, the testator, Henry Parish, before his paralytic attack, was a man of remarkable business ability, and possessed of an ample fortune; and simply to appreciate and understand his property, varied in kind as it was, required at least ordinary comprehen-

sion. Mr. Parish was also a man of scholarly attainments, of affectionate disposition, and courteous in manner. After his paralytic attack, he never showed the least desire to communicate with his family or friends, and every attempt to induce him to write, to learn to express himself by the use of letters printed upon blocks, or by any other expedient, resulted in complete failure. He could not speak at all, and only gave any expression by signs which the principal beneficiary in the rejected codicil says were unintelligible and contradictory, at times were of assent and at others of dissent, or were absolutely meaningless; and the execution of the will depended upon these uncertain signs. During the several years in which he was a confirmed paralytic he never engaged in a single business transaction, or even manifested the slightest interest in the management of his vast property; and it is hardly presumable that if, at any time, a ray of intelligence had penetrated his beclouded intellect, he would be so wholly silent and apathetic, when he had such large business interests, and was, before his attack, of so acute perceptions on matters of business. His intimate friend testifies that, during all the time of his protracted illness, although he was a daily visitor, yet he never noticed the least gleam of intelligence, not the slightest intimation that the testator recognized him or realized what he was doing. His personal habits were uninterruptedly unclean and filthy. Hemiplegia, with facial paralysis, had distorted his countenance, and this dread malady, in that form, is usually a sure indication that the mind is affected.

To say that Henry Parish and Demarius Sheldon were counterparts, that they were afflicted with the same men-

tal derangement, is equivalent to saying that paralysis operates exactly alike upon all persons, that mental weakness, in fact an entire absence of mental power, is a necessary concomitant of hemiplegia—a statement that meets with daily contradictions.  That Demarius Sheldon engaged in intelligent conversation repeatedly is shown from the undisputed evidence.  That she, at times, displayed prudence and shrewdness in her little business matters, that she talked sensibly at the time of the execution of the will, are facts established beyond a doubt.  That her hallucinations were intermittent, and were not of daily occurrence and were followed by rational conduct on her part, are also facts potent in her unfortunate history.  The same acute perceptions, the same enlarged comprehension, are certainly not required in disposing of a few acres of land in a rural district and a few notes, as in distributing a diversified property of the value of one million dollars.

The will of Parish was confessedly unjust, resulting substantially in the disherison of brothers whom he always loved, and adding to his wife's portion when it was already superfluous in amount.  The will of Demarius Sheldon has no element of injustice worked into it.  Thaddeus, who was one of the principal beneficiaries in the previous will, bore no close relation to testatrix, and he does not even come into court to dispute the justice of the last will, or to assert his rights.  The contestant is in court by force of a mere technical provision of the statute, and all those interested in the rejection of the will being of full age and not authorizing any appearance, the contestant appears in the attitude of a volunteer.

Under such circumstances, proof of the mental inca-

pacity of testatrix should be of unusual force to justify a court in rejecting the will.   I have carefully examined the cases cited by the counsel for the contestant, but find none so favorable to their position as the Parish case, and, as I have endeavored to show, there are many features distinguishing that case from the one under consideration.

I, therefore, find that the will made by Demarius Sheldon on January 31st, 1881, was her last will and testament; that the same was properly executed; that, at the time of its execution she was of sound and disposing mind and memory, and was under no restraint; and I direct that the same be admitted to probate as a will of real and personal estate.

Decreed accordingly.